BALBACH and others *v.* FRELINGHUYSEN, Receiver, etc.

*(Circuit Court, D. New Jersey.* March, 1883.)

1. BANKS—PROPERTY IN CHECKS DEPOSITED FOR COLLECTION.

Checks deposited in a bank by its customers for collection, do not at once become the property of the bank; the bank continues to be the agent of the customer until the collection of the check, which remains, in the mean time, the property of the depositor.

2. SAME—DIFFERENT RULE, WHEN.

The rule is different where such checks are deposited to make good an overdrawn account of the customer, or when the amount deposited by check is immediately drawn against; in that case the bank may hold the deposit until the overdraft is made good from other sources.

3. SAME—CASH DEPOSITS.

Unlike checks, cash deposited by customers with the bank ceases to be the property of the depositor, and becomes the property of the bank, creating at once the relationship of debtor and creditor.

4. SAME—INDORSEMENT.

The indorsement by the customer of a check, deposited for collection, is only intended to put the paper in such shape that the bank may collect it, and not to thereby pass the title to the bank.

5. SAME—PRACTICE OF CREDITING CHECK DEPOSITS.

The practice which has grown up among banks to credit deposits of checks at once to the account of the depositor, and to allow him to draw against them before the collection, is a mere gratuitous privilege, which does not grow into a binding legal usage.

6. SAME—NOTES RECEIVED FOR DISCOUNT—OFFSET.

The plaintiffs seek to offset the amount of their credit on the books of a defunct bank, against the promissory notes received by the bank for discount before its failure. *Held,* that if the bank held the notes at the time of its failure and was entitled to receive the amounts due thereon when they matured, such offset might be made; but an offset of this kind cannot be allowed where it appears that the notes were not the property of the bank at the time of its failure, but had been indorsed away for value.

7. SAME—BANK'S INSOLVENCY—KNOWLEDGE BY THE CASHIER.

No knowledge by any of the officers of a bank, of its insolvency, is sufficient to avoid transactions between the bank and its customers, on the ground of fraud, unless the evidence clearly shows that the directors, who represent the corporation, also had such knowledge.

On Bill and Answer.

This case has been heard on bill and answer, except so far as they have been explained or qualified by the admission and proofs of the parties, in a stipulation filed at the hearing. It was therein agreed:

(1) That the last day on which the Mechanics' National Bank of Newark carried on the general business of banking was Saturday, October 29, 1881; that on Sunday, October 30th, the cashier disclosed to its board of directors its insolvent condition; that the board then resolved to close the doors of the

bank; that it should be put in the hands of a government examiner for the purpose of ascertaining its condition; that accordingly the doors of the bank were closed' on Monday, October 31st, and no banking business was afterwards transacted, except that relating to items for collection, receiving money due the bank and receiving special deposits, as for paying notes due at the bank, of, which separate accounts were kept, and which special business was done under the charge of the examiner; and that, as the result of an examination, the bank was declared insolvent, and the defendant was appointed receiver on November 4, 1881.

(2) That in a suit in this court, at law, by the defendant, as receiver, against Stephen H. Condict, an affidavit, of which a copy is annexed, marked Schedule A, was made by the defendant; the defendant, on this hearing, being entitled to object to the relevancy and materiality of the affidavit in this cause.

(3) That the letters of which copies are annexed, Schedule No. 2, were written and sent by the complainants to the Mechanics' National Bank of New York, the relevancy and materiality of which may be objected to by the defendant in this cause.

(4) That the schedule annexed, marked No. 3, is the account between the Mechanics' National Bank of New York and the receiver, showing their collateral account and the settlement of the same between them.

## The bill of complaint alleges the following facts:

(1) That the complainants have been engaged in business for some years past, in the city of Newark, as smelters and refiners of gold, silver, and other metals; that they kept an account in the Mechanics' National Bank of Newark, depositing therein, from time to time, large sums of money; that on the twenty-ninth of October, 1881, being Saturday, and the last day on which the said bank transacted any business, they left with it, for collection, a check of that date, drawn by Hague & Billings of the city of New York, upon the American Exchange Bank of that city, and payable on demand to the order of complainants, for the sum of $11,781.93, the said check being duly indorsed by complainants; that the bank, instead of receiving and holding the same for collection only, and as a trust for the benefit of the complainants, credited the check on its books as so much cash, and as if it had been indorsed to the bank as its property, and its amount constituting so much indebtedness on the part of the bank to the complainants.

(2) The bill further alleges that at the time of the failure of the bank the complainants were indebted to it in the sum of $30,000, the amount of two promissory notes discounted by the bank for them, and the proceeds of which they had received, to-wit, one note dated July 19, 1881, made by complainants to the order of one H. M. Diffenbach, for $15,000, payable at the bank four months after date, and which was indorsed by Diffenbach for their accommodation, and the other in the like sum, dated August 13, 1881, payable four months after date, also to the order of Diffenbach, and indorsed by complainants; that each of said notes fell due after the failure of the bank; that if the same, or either of them, was held by the bank at the time of its failure, the complainants were entitled to set off against the same any indebtedness due from the bank to them, and thus have the benefit of the full amount of such indebted-

ness, and not merely a dividend thereon from the assets in the hands of the receiver; that by the books of the bank, and upon the bank-book of complainants, as written up by the clerks of the bank since the failure, it is stated that there was due to complainants from the bank, at the date of its failure, the sum of $18,872.63, but that said sum was made up by the wrongful crediting to complainants, against their will and protest, of the aforementioned check for $11,781.93; that said amount should be deducted therefrom, so that the true indebtedness to complainants, at the date of the failure, was only the sum of $7,090.70; that at the time of the failure of the bank it was the holder of both of said promissory notes, and that complainants are entitled to set off against their payment any balance which really existed in their favor, as depositors, against said bank, whether the same was the smaller sum of $7,090.70, or the larger one of $18,872.63.

The bill further alleges, that the complainants were informed that at the time of the failure of the bank the said notes were not actually in its hands at Newark, but had been sent to the Mechanics' National Bank of New York, having been pledged to said bank as collateral security for an indebtedness then existing on the part of the Newark bank to it; that a large amount of promissory notes and other negotiable paper had been pledged at the same time with the said notes, much larger than said indebtedness, and that the other negotiable paper had been paid, and thereby the Mechanics' National Bank of Newark and its receiver became entitled to the notes of the complainants; and that said notes ought to have been returned to the receiver, and the amount of complainants' credit on the books of said bank applied to the discharge thereof; but that neither of said notes were so returned, and the same, when due, were found by the complainants in the hands of the Newark National Banking Company, to which they had been sent for collection, and that complainants were compelled to pay, and did pay, the same at maturity,—at the same time giving notice to the National Newark Banking Company, and the Mechanics' National Bank of New York, and to the receiver, of their rights in the premises.

The bill claims that the said check, being left for collection on the last day that the doors of the bank were open for the transaction of business, and when the bank was utterly insolvent and was known to be so by the cashier and some of the directors, and being still in the hands of the bank when its doors were closed on the next business day, ought to have been returned to the complainants, and prays:

(1) That the same be now delivered up by the receiver, to be canceled; (2) that the receiver may be restrained from bringing any suit upon the same, either within the limits of New York or New Jersey, or the United States; (3) that an account be taken of the indebtedness which existed at the time of the failure of the bank from it to the complainants, and that it may be decreed that such indebtedness was and is a lawful and equitable set-off in favor of complainants against their indebtedness, by reason of said promissory notes, and that complainants, having paid the same, are entitled to have a return from the receiver of the moneys by them paid, to the amount of such

indebtedness, and that he be decreed to make such payment accordingly, without regard to the amount of any dividend declared or to be declared to the general creditors.

The answer of the defendant states that the Mechanics' National Bank of Newark closed its doors on the thirty-first of October, 1881, and, after an examination into its affairs by the comptroller of the currency, was declared insolvent, and that defendant was appointed receiver on the fourth of November, 1881, under the national banking laws, and that, as such receiver, he represents all the creditors of the association, and has no right or authority to prefer any one of the unsecured creditors before another, and that he is bound so to administer and protect the assets in his hands as to distribute the same equally among the persons entitled thereto. It admits that on Saturday, October 29, 1881, the complainants deposited with said bank a check, drawn by Hague & Billings, of New York, upon the American Exchange National Bank of New York city, payable to their order, for $11,781.93, and says, in reference to said deposit, that the check was indorsed in blank by complainants and was at once credited to them as cash upon their pass-book and upon the books of the bank; that, according to the usual custom and course of business, between complainants and the bank, the complainants were at once entitled to draw against the same, if they chose so to do, as upon so much cash paid in, and that no special agreement or contract was made in reference to said deposit; that by the receipt of said check the bank was entitled to forward the same for collection and to receive credit for the whole amount thereof, as its assets; that its liability to the complainants was like its liability to any other creditor, and that complainants, after delivering said check for collection, had no right to prevent the collection or stop the payment thereof after the failure of the bank and its assets had become a general fund for its creditors.

It further states that on the thirty-first of October, 1881, and before any demand for the return of said check, the same was forwarded by E. H. Shelley, the government examiner in charge of the bank, to New York for collection, and was by him charged to the account of the National Park Bank of New York, to whom the same was sent; but that it was not collected because the payment thereof had been stopped, although the makers were able to pay the same, and have offered to pay the amount to defendant if complainants would consent, and that said check had been protested and returned to defendant, and is now in his possession or under his control, the

defendant claiming the same as a part of the general assets of the bank.

The answer also admits that the credit of the bank stood very high in the community at the time of the deposit of the check; that statements of its condition had been published from time to time, sworn to by the cashier, and certified by some of the directors, which were wholly false; that their falsity was known to the cashier, but not to the directors certifying to the truth of the same; that the bank had been in fact insolvent for many years, but a knowledge thereof had never come to the directors until Sunday, October 30, 1881, when they were told by the cashier that it was ruined by his defalcations and unlawful abstractions to the amount of over $2,000,000; that the board of directors immediately ordered its doors to be closed, and that it be placed in the hands of a government examiner for investigation.

The defendant insists that the cashier's knowledge of the insolvency of the bank was not imputable to the bank or its directors, and that complainants had no right, on account thereof, to demand the return of the check and revoke the contract on their discovery of the insolvency, and that they could have no such right unless the directors, managing the affairs of the bank, carried on its business after a knowledge of its insolvency; that the deposit of the check was not received in contemplation of insolvency, but that at the time of receiving the same the directors and also the cashier expected and intended to carry on the business of the bank in its usual course.

The answer further states that at the time of its failure the bank was indebted to its depositors in about the sum of $2,700,000, all or nearly all of which had been received since the bank was, in fact, insolvent, but was not so known to be by its directors, and was all received, as was the deposit of complainants, with the expectation and intention on the part of the directors of continuing the business; that the assets are not sufficient to pay in full all deposits; that defendant is holding all the assets, including said check, for equal distribution among the creditors, and that delivering said check to complainants would practically amount to giving them a preference for their claims over other creditors.

The answer denies that, at the time of the failure of the bank, the complainants were indebted to it in the amount of two promissory notes, set out in paragraph 7 of the bill of complaint, or of either of them. It admits that the first of said notes—for $15,000, dated

July 19, 1881—had been discounted for complainants previous to the failure of the bank, but denies that the other note, dated August 13, 1881, for the same amount, was ever discounted by the Newark bank, alleging that it was discounted by the Mechanics' National Bank of New York on the tenth of October, 1881, and the proceeds charged on that day against the New York bank and credited to the complainants on the books of the Newark bank; that said note, from the time of its discount to the date of its payment, belonged to and was the property of the said New York bank; that so far from its being true, as alleged in the bill, that the Mechanics' National Bank of Newark, at the time of its failure, was the holder of said notes, it, in fact, held neither; but, on the contrary, it had, during the 'month of October, 1881, indorsed over and delivered the note dated July 19, 1881, along with other notes before discounted by the said Newark bank, to the amount of about $442,000, to the Mechanics' National Bank of New York, as collateral security for about $400,000,—the amount of loans and overdrafts of the Newark bank, —and that, at the time of the failure of said bank, and when it came into the defendant's hands, the said indebtedness had not been paid, but still existed, to the amount of $273,000; that the New York bank claimed, and was entitled to, the right of collecting for its own benefit, and for applying, in said indebtedness, the proceeds of all of said notes so held as collateral security, including the said note dated July 19, 1881, which had been discounted for the complainants; that the said first note of complainants was indorsed generally, and not for collection; that at the time of the failure of the bank, and when the said note was matured, the debt of the Newark bank to the New York bank had not been paid, and the New York bank was entitled to receive, and did receive, the amount of the same as a credit upon said indebtedness; that the indebtedness was not fully paid when the second note became due; the amount paid to and received thereon by the New York bank never came to defendant's hands, but was regularly, and in due course, applied by the New York bank to the payment of the debt due from the Newark bank; that the other note, dated August 13, 1881, was the sole and absolute property of the New York bank upon its discounting the same; and that at the time when complainants paid said notes, as stated in the bill of complaint, the defendant had no right to the return of said notes, or to receive the same; and that complainants are, therefore, not entitled to the set-off claimed in their bill to the amount of said notes.

*Cortlandt Parker* and *R. Wayne Parker,* for complainants.

*John R. Emery,* (with whom was *A. Q. Keasbey,*) for receiver.

Nixon, J.   The pleadings and stipulations present two questions for consideration:

(1) Whether the complainants are entitled to have the check, which was deposited by them for collection on the twenty-ninth day of October, 1881, and not forwarded until after the bank was closed, returned to them on account of the insolvency of the bank.

(2) Whether the receiver should allow to the complainants the balance due to them from the bank, at the time of its failure, as an offset to their indebtedness upon the two promissory notes for $15,000 each, and respectively dated July 19 and August 15, 1881.

There is no difficulty about the facts of the case.   All the material facts are admitted.   The complainants were the regular customers of the bank, and were the owners of Hague & Billings' check upon the American Exchange National Bank of New York for $11,781.93, payable to their order, which they indorsed generally and left with the Newark bank for collection.   It was the custom of the bank, at least in regard to these depositors, to credit their account with such foreign checks when left, and to enter the amount at once upon their pass-book.   Such credits were made in this case on the twenty-ninth of October, when the check was deposited for collection.   The bank was then indebted to the complainants in the sum of $7,090.70 on previous deposits, and the credit of the check in question increased its indebtedness to $18,872.63, for which sum the complainants were entitled to draw.   The next day was Sunday, when the cashier revealed to the directors the insolvency of the bank.   Its doors were closed on Monday.   A government examiner took charge at once, and finding the check still in the hands of the bank he forwarded it to New York for collection.   It was not paid by the drawers,—its payment having, in the mean time, been stopped.   It has never yet been paid, although the makers are pecuniarily responsible.

The complainants claim that they are entitled to the return of the check:

(1) Because, although it was indorsed generally, and the amount had been credited to the depositors upon their pass-book and the books of the bank, the deposit for collection did not make the check the property of the bank, the bank continuing to be the agent of the customers for its collection, and the check remaining, in the mean time, the property of the depositors.   (2) Because it was fraudulent on the part of the bank to receive the check for collection at a time when it was insolvent, the insolvency being caused by and known to the cashier, who had been intrusted by the directors with the general management of the business of the association.

With regard to the first claim there seems to be no well-settled rule. I was under the impression, on the argument, that the weight of authority was in favor of the doctrine that, whenever a banking association gives credit upon its books to a depositor for the amount of a check or negotiable paper deposited for collection, the title to the check or paper immediately passed to the bank, and it became the holder of the same for value. But I am satisfied, upon reflection, that this is not true, without qualification.

When the deposit was made and credited in order to make good an overdrawn account of the customer, or where the amount thus credited was immediately drawn against, the bank is undoubtedly to hold the check, at least, until the overdraft of the account is made good from other sources, or the cash drawn on the strength of the credit has been returned. The first of these conditions existed in the case of *Titus* v. *Mechanics' Nat. Bank*, 6 Vroom, 592, and the opinion of the court of errors of New Jersey must be construed in reference to that fact. The learned counsel of the defendant also relied upon the decision of the chancellor in *Terhune* v. *Bergen Co. Bank*, 7 Stew. 367, in support of the doctrine. But the controlling fact in that case was that the checks, which were credited to the account of the depositor by the Bergen County Bank, had been forwarded to the Chatham National Bank of New York for collection, and had been collected and the proceeds credited to the Bergen County Bank before its failure. The claim there was that the depositor was entitled to preference in payment over other depositors.

It was correctly held that the complainant was only a general creditor of the bank for the proceeds of the collection, and must accept his dividend like other depositors. Such was declared to be the rule in *Foley* v. *Hill*, 2 H. L. Cas. 28, in which the relations of the banker and customers are very ably discussed and stated. The claim of the appellants was that the relation was that of trustee and *cestui que trust;* but their lordships held that it was rather that of debtor and creditor. When the customer deposits cash with the bank it ceases to be the money of the depositors, and becomes immediately the property of the bank; but when he deposits a check for collection in the absence of any special contract, the property in the check remains in him, and the bank becomes his agent for its collection, and has no responsibility in reference to its payment, except that it assumes to neglect no duty in the matter of its collection. When the collecting bank has notice of its payment, and is credited

by its correspondent with the proceeds, it then becomes the debtor to the owner for the amount of the check.

The case (*Ex parte Richdale, In re Palmer*, 19 Ch. Div. 409) was also cited by the counsel of the defendant in support of the rule that the moment the check was credited by the bank to the depositor it became the property of the bank, and it was its holder for value. It is true that the master of the rolls, (JESSEL,) in reviewing the decision of BACON, C. J., did state that doctrine as the law, but it was *obiter dictum* in the case, and the court expressly alleged that they preferred to base their decision on the ground that the transaction came within, and was protected by, the provisions of the ninety-fourth section of the bankruptcy act of 1869.

In the present case the receiver's counsel insist that the indorsement of the check to the bank, and its credit upon its books and upon the pass-book of the complainants, are conclusive evidence of a special contract that the check should at once become the property of the bank for value. The reply is twofold: (1) That in all cases where credits are thus made banks claim and always exercise the right of charging checks returned to them for non-payment to the account of the depositor, which could not be done if the check had become the property of the bank, and did not remain the property of the depositor until collected. (2) The practice, which has grown up among banks, to credit such deposits at once to the account of the depositor, and to allow him to draw against them before the collection has been made, is reckoned by the ablest text writers, a mere gratuitous privilege, which does not grow into a binding legal usage.

Morse, in his treatise on Banks & Banking, in discussing this subject in his chapter on "Collections," p. 427, says:

"Where the customer deposits in the bank commercial paper for collection, at the same time indorsing it over to the bank, the parties understanding that it is only intended by the indorsement to put the paper in such shape that the bank can collect upon it, the title in the paper does not thereby pass to the bank, nor does the bank owe the amount to the customer until such time as the collection is actually consummated. Neither is this strict right of the bank curtailed or altered simply because a practice has been allowed to prevail by which it has allowed the depositor to draw against deposits of paper for collection before the collection has been actually made. This is a mere gratuitous privilege allowed by the bank, which does not grow into a binding legal usage. Thus, it is very common for depositors to deposit checks with their banks, and to draw against them on the same day checks of their own, which may be presented for payment before the bank has had an opportunity to collect upon the deposited checks. In such cases banks are fre-

quently wont to honor such checks of their customers upon the confidence that the deposited checks will be duly paid. But this habit of the banks is a pure favor, and if there be no distinct understanding to change the natural effect of such dealing, its long continuance gives no real right whatsoever to the depositor to demand its continuance or its practice in any individual case wherein the bank may, for any arbitrary reason, see fit to withhold that favor. *Scott* v. *Ocean Bank*, 23 N. Y. 289. In England, a decision given by Lord ELLENBOROUGH (9 East, 21) went much further even than this. Bills, not yet due, were sent to a country banker to collect. According to the custom of country bankers these were actually entered in the banker's own books to the depositor's credit, with the proper discount, and he was thereafter entitled to draw against this credit before the actual collection. Upon the subsequent failure of the banker, before the collection, it was held that the title in the bills had not passed to him, and that the depositor should recover them specificially, or their amount, if the bankrupt's assignee had already made the collection."

Nothing more than this is asked for by the complainants in the case under consideration. The accounts between the depositors and the bank were in nowise changed from the date of the deposit to the closing of the doors of the bank against further business. It is true, the credit had been entered on the books of the bank; but it was not to make good an overdrawn account, and if it enabled the depositors to draw against the credit, they had not, in fact, done so. The check was still in the hands of the bank when it stopped. It was, perhaps, a gratuitous act for the bank examiner to send it forth for collection. But, whether it was so or not, it was not honored by the bank on which it was drawn, and was returned unpaid to the receiver.

The naked question is whether, under such circumstances, the right to recall the check remained with the depositors, or whether it had passed beyond their reach. I see no reason, in principle, which should not allow them to recall it. It was their property until collected. If the bank had continued business, and the check had been returned unpaid, it would have been charged up to their account and handed back to them. The receiver, in the new condition of affairs growing out of the insolvency, represented the bank, and when the check came back to him ought to have charged the account of the depositors with the amount and returned it to them.

This view of the case renders it unnecessary for me to consider whether the complainants were entitled to its return on account of the fraud which is alleged to have been committed by the officers of the bank in receiving the check for collection when the cashier, acting for the directors, was aware of the total insolvency of the association. It is proper, however, to observe that no knowledge by any

of the officers of the bank of its insolvency is sufficient to avoid the transaction, unless the evidence clearly shows that the directors, who represent the corporation, also had such knowledge.

I have much less difficulty with regard to the other question raised by the pleadings and the evidence, to-wit, the right of the complainants to offset the amount of their credit on the books of the bank, at the time of the failure, against the two promissory notes, for $15,000 each, which the bank had received from them for discount in the months of July and August preceding the failure.

It is unquestionably true that if the Newark bank held these notes at the time of the failure, and was entitled to receive the amounts due thereon when they matured, such offset might be made. But the evidence is clear that at that date the notes were not the property of the Newark bank, but had been indorsed away for value. The facts are that the second of these notes, dated August 19, 1881, was never discounted by the Newark bank. It was sent to the Mechanics' National Bank of New York for discount, and the proceeds were duly credited to the makers on the books of the Newark bank. When it fell due it was still the property of the New York bank and was paid to it by the makers—the Newark bank having no interest whatever in the note or its proceeds.

The first note, of July 19, 1881, stands in a different position, but not in one which allows the offset to be made as demanded. It was regularly discounted by and became the property of the Newark bank on the twentieth of July, 1881, and the proceeds placed to the maker's credit on that day. Afterwards, in the month of October, the Newark bank, having largely overdrawn its account with the Mechanics' National Bank of New York, sent to the latter bank a batch of paper, which had before been discounted, in which was included said note of complainants, amounting in the aggregate to $442,000, as collateral security for the payment of said indebtedness. The amounts of these notes, as they matured and were paid, were credited on the account, for the payment of which they had been indorsed as collaterals. When the Newark bank failed there yet remained due upon said indebtedness upwards of a quarter of million of dollars, and the New York bank claimed, and I think had, the right to retain the indorsed notes (including the one of complainants) not due or paid, and to apply the proceeds as they severally and in the order in which they became due to the payment of the remaining indebtedness. When the said first note of complainants ma-

tured, it was collected and the amount applied to the extinguishment of the said debt.

But when the notes were all collected the New York bank had remaining in its hands about $7,000 over and above what was necessary to pay said account against the Newark bank. It paid the surplus to the receiver, and the complainants insist that they have at least an equitable lien thereon, and that the receiver should offset the same by allowing said surplus to be paid on account of the last-named note. This claim cannot be allowed. It was the duty of the New York bank to apply the proceeds of the notes, as they were severally paid, to the extinguishment of the debt for which they were collateral, and when complainants' note was paid and credited the receiver had no right to demand, nor was the New York bank bound to refund, any part thereof until the overdrawn account was fully paid. Nor will the receiver be permitted, as against the other creditors of the insolvent bank, to use any portion of this surplus to give a preference over them to the complainants.

Let a decree be drawn in conformity with this opinion, with costs of the complainants.