**AMERICAN LEGION POST NO. 90 OF VILLAGE OF MAMARONECK et al. v. FIRST NAT. BANK & TRUST CO. OF MAMARONECK et al.**

No. 396.

Circuit Court of Appeals, Second Circuit.

July 22, 1940.

---

Burton C. Meighan, Jr., of New York City (Meighan & Necarsulmer and Louis A. Marchisio, all of New York City, and James S. May, of White Plains, N. Y., on the brief), for plaintiffs-appellants.

Monroe J. Cahn, of White Plains, N. Y. (Lynch & Cahn and Harold M. Miller, all of White Plains, N. Y., on the brief), for defendants-appellees.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

CLARK, Circuit Judge.

In 1921, 83 citizens of the town of Mamaroneck subscribed a total sum of $15,641.75 towards the purchase of premises to be used for the erection of a Community House as a memorial to the veterans of the World War. Title to the land purchased was taken in the name of one McArdle, one of the subscribers to the fund. After this first flush civic spirit seems to have lagged somewhat, and funds were not forthcoming for the building of the house itself. In due time, therefore, decision was made by the subscribers to sell the premises, and by November, 1928, a purchaser was found for the land for the sale price of $160,000.

Meanwhile McArdle had died, and his wife, who took title to the property, deeded it to The First National Bank and Trust Company of Mamaroneck (the "old bank") according to the arrangements which had been made on the advice of a title company for the proper effectuation of the contract of sale. The old bank accepted

the conveyance, entered into the contract of purchase, eventually conveyed the property to the purchaser, and received back part of the purchase money in cash and ·a purchase money mortgage in the sum of $130,000 payable by March 1, 1930. Payments were made in due course, so that. by May 15, 1930, the old bank had received a final payment of the entire purchase sum, together with interest accruements. It made certain disbursements of expenses and payments on the principal to the subscribers. In January, 1932, the "new bank," First National Bank of Mamaroneck, was organized to assume all the liabilities and obligations of the old bank; but it failed in January, 1933, at which time the Comptroller of the Currency found it to be insolvent and appointed a receiver for it. The old bank was likewise declared insolvent and a receiver appointed in February, 1934. The payments made against the account by the two banks totaled $102,318.81, leaving a balance on hand of $60,964.39, the amount here involved at the time of the failure of the new bank. The matter was before this court and these facts are recited in the case of Meeker v. Durey, 2 Cir., 92 F.2d 607, involving the issue of income tax liability on these funds. The present questions are whether the fund was held by the banks as a general deposit or as a trust, and if the latter, whether or· not certain securities set aside by the banks for their trust funds pursuant to statute may now be availed of for the payment of the balance due. The district court found only a general deposit and allowed plaintiffs merely their general claim.

The plaintiffs are a portion of the original subscribers .to the fund who are suing on behalf of themselves and all others similarly situated. The court below found that they were proper representatives of all the subscribers, and that this action was properly brought as a class suit under former Equity Rule 38, 28 U.S.C.A. following section 723, and Federal Rule 23, 28 U.S.C.A. following section 723c; that portion of the judgment below is not the subject of appeal. Nor is there appeal from so much of the judgment as allots

to the subscribers a refund of income taxes in the amount of $20,188.99 secured by the receiver as a result of Meeker v. Durey, supra. In that case, which was a suit by the receiver of the new bank against the estate of the Collector of Internal Revenue, the plaintiff claimed a refund of taxes assessed against him as trustee or fiduciary in respect of this same fund. We held that the bank was not taxable as a fiduciary, since under New York law the deed to McArdle and the later deed to the bank gave rise only to a so-called passive trust; and we made an alternative ruling that even if the bank was a fiduciary, the income, consisting of gains on the sale, was not accumulated for the benefit .of unborn or uncertain persons. Hence the income, if any, was taxable to the subscribers, and· not to the bank.

The controlling statutory provisions in issue here are contained in a lengthy :section of .the Federal Reserve Act, § 11(k), 12 U.S.C.A. § 248(k), authorizing and empowering the Board of Governors of the Federal Reserve System to grant by special permit to a national bank applying therefor the right to act as trustee and in various other named representative capacities, including those of executor, administrator, or receiver, "or in any other fiduciary capacity" in which competing state banks may act. It is provided that national banks exercising the powers enumerated in this subsection "shall segregate all assets held in any fiduciary capacity from the general assets of the bank and shall keep a separate set of books and records showing in proper detail all transactions engaged in under authority of this subsection." Then it is stated that "No national bank shall receive in its· trust department deposits of current funds subject to check or the deposit of checks, drafts, bills of exchange, or other items for collection or exchange purposes." [1] Next follows the provision specifically in issue: "Funds deposited or held in trust by the bank awaiting investment shall be carried in a separate account and · shall not be used by the bank in the conduct of its business unless it shall first set aside in the trust department United States bonds

[1] This particular provision. has been held to be a prohibition against receiving deposits of third persons and not applicable to deposits of funds held by the bank itself. Carcaba v. McNair, 5 Cir., 68 F.2d 795, certiorari denied 292 U.S. 646, 54 S.Ct. 780, 78 L.Ed. 1497; cf. Fesenmeyer v. Salt Springs Nat. Bank, 2 Cir., 92 F.2d 599; and see, also, Ticonic Nat. Bank v. Sprague, 1 Cir., 90 F. 2d 641, affirmed 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926.

or other securities approved by the Board of Governors of the Federal Reserve System." And the statute continues that in event of the bank's failure the owners of the funds held in trust for investment shall have a lien on these securities so set apart, in addition to their claim against the estate of the bank.

In this case each of the banks here involved treated the funds received from the sale of the Community House property as part of its trust funds, carried the accounts thereof in its trust department, and set aside securities for the protection of this fund and its other trust funds. The method which was followed was not the allocating of separate securities of the bank to each trust fund, but merely the earmarking for the trust department of securities generally to cover the shifting balance due the trust department for all its trust funds. Since the assets of the bank set aside for the trust department are adequate to cover all the trust accounts, including the account now under discussion, it is obvious, and indeed not disputed, that the bank intended to protect this fund as a trust fund. The objections made are really three: that the fund was only a general deposit without priority, and the course of dealing indicates an intention that the bank should use the funds for its general purposes; that there was no agreement with the subscribers to hold the funds "for investment," but only for distribution, thus taking the matter outside the quoted statute; and that, since no securities were set aside separately for this particular fund, there were no securities available to which priority might attach.

■ 1. We are clear that the banks held the funds in a fiduciary capacity, and that the arrangement created something more than a general deposit. It is true that the court below made a specific finding of fact, which it repeated as a conclusion of law, that no agreement was at any time requested of, or made by, the old bank or the new bank that the said money should be held in trust or deposited in the trust department of the bank, or be invested on behalf of the contributors, or in any manner secured, with a further finding that the banks carried the account in the trust department merely as a matter of convenience to themselves. There was testimony by the president of the old bank indicating that the funds had been received in trust, but this the court seems

to have rejected. We think effect may be given to the finding to the extent of its holding that no express agreement as to the manner of carrying the fund was made; but a conclusion of law that this account was only a general deposit does not necessarily follow therefrom and is in truth at variance with other facts either admitted or clear of record.

As early as 1921 the McArdles executed a formal document expressly declaring that title to the property was held by Mr. McArdle "only as an intermediary" until it should be determined by the persons in charge of the Community House movement that it should be deeded to some one else, and they thereby agreed to deed the same when and how properly directed. From time to time thereafter McArdle was referred to as trustee of the Community House property. The bank, when it took title with full knowledge of this arrangement, necessarily did so as a similar "intermediary." True, the language used seems to signify that McArdle first and the banks later were not to be express trustees. Indeed, it is made clear throughout that the subscribers to the fund or a committee thereof should give directions as to the disposition of the property. On the other hand, it is quite evident that these parties were acting as fiduciaries, and the characterization of the situation as a passive trust in our earlier decision seems the most apt designation. Certainly while the bank held title to the real estate it was something more than a mere debtor to the subscribers for the amount invested in the realty. When it collected the proceeds, it could hardly have altered its character to that of a mere debtor unless it acted in a manner clearly evidencing its intent to do so and unless the subscribers knew of and acquiesced in the change. Neither of these conditions is shown to have occurred.

■ Stress is placed upon the circumstance that the attorney for the subscribers, who was also attorney for the bank, requested deposit of the fund in the interest department of the bank, and later requested that the deposit be held so as to produce interest. But it is difficult to see why this circumstance, if it has any persuasive force, does not tend to indicate that the fund was held by the bank as a trust, rather than as a general deposit. A bank acting as trustee or fiduciary would be expected to produce an increment on funds

in its hands. It would also naturally receive a fee for its services, as was the case here.

We turn to the "course of dealing" relied upon by the district court to show that the banks could use the funds for their general purposes. All incidents referred to seem either undecisive or even more suggestive of the fiduciary relationship than of the contrary. First is the circumstance just noted—that interest was credited at the rate of 3 per cent—a course which would seem to be more natural for trust funds than for general deposits. Next reference is made to the fact that the money was left with the bank for a long period of time. Such delay is explained by necessary incidents of the entire transaction, including the litigation with reference to income taxation; the delayed payments provided for in the contract of sale; the necessity of ascertaining who were the present representatives of the original subscribers, leading to the institution of a suit in the state court to determine such ownership; and the financial difficulties, the attempted reorganization, and the later receiverships of the banks. Finally, the large amounts disbursed from time to time for expenses and attorney's fees, directed by the committee, seem without particular significance. Of course, it was the committee, not the bank, which was in general charge of the transaction. But that, we think, goes no further than to show the relationship to be a passive, rather than an express, trust.

We conclude that, notwithstanding the district court's finding, the account must be considered as one held by the banks in a fiduciary capacity, and not as a general account. In re Kountze Bros., 2 Cir., 103 F.2d 785, is not in point. There funds were deposited for a claimed special purpose, but we held the proof insufficient to show that there was an intended segregation from the general accounts. There the private bankers did not hold the funds in a fiduciary capacity.

2. Perhaps more serious is the further claim that these were not funds held in trust "awaiting investment" and hence without the statute. We think, however, that this is too narrow a construction of the statute, and really defeats its intent. If trust funds held for investment are subject to the statute, but trust funds held for distribution are only general assets of the bank, then we find a serious difference in result following from a very slight, even formalistic, change in the relations of the parties. It would be no great stretch to term this a fund held "for investment," particularly since the desire of the subscribers for some increment on their funds was made so clear. It was not to be fully paid in for a year and a half; it was to bear interest at a substantial rate; it was subject to various difficulties of adjustment, including income tax litigation and other litigation which remained unsettled on the bank's failure more than four years after the first receipts were had.

Moreover, a broader interpretation should be given to the statute. We think that the provisions for security include in general the fiduciary funds which the bank is required to keep segregated from its general assets. Such, indeed, is the view taken by the Board of Governors of the Federal Reserve System in their Regulation F promulgated under the power to issue regulations granted by this same statute. This regulation provides that when funds received and held in the trust department of a national bank "awaiting investment or distribution" are deposited in the commercial or savings department of the bank to the credit of the trust department, security for the deposit must be provided in the shape of United States bonds or other specified assets of the bank. Defendants assert in their brief that this regulation was not called to the attention of the court below, and that therefore we cannot take judicial notice of it. It seems, however, that, while an appellate court is not obligated to notice matters not brought to the attention of the trial court, Line v. Line, 119 Md. 403, 86 A. 1032, Ann.Cas. 1914D, 192, yet it may take such notice where necessary either to affirm, or to show the impropriety of, a decision below. Hunter v. New York, O & W. R. Co., 116 N.Y. 615, 23 N.E. 9, 6 L.R.A. 246. With respect to a regulation required by the statute for the carrying into effect of its terms, we should not hesitate to take judicial notice so far as is necessary. The point is not decisive here, since all we are saying is that the interpretation made by the Board of Governors of the Federal Reserve System accords with our own. It also accords with the conclusions reached in the other cases cited. Carcaba v. McNair, supra; Fesenmeyer v. Salt Springs Nat. Bank, supra; see also

Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184.

3. We do not think the objection that the securities were provided for all the trust funds without definite segregation is sound, especially when asserted by the bank's receiver. Regulation F above does not require segregation. Such a course, if required, would be a burdensome one, undoubtedly adding to the expense of carrying a trust account, particularly in the case of smaller trusts. We do not see how it adds very much to the security of the funds; it may indeed make each fund less secure by restricting the securities available to it in the event of the bank's failure. Cf. Legis., 37 Col.L.Rev. 1384. At any rate we think the intent of the statute was complied with. This makes unnecessary consideration of the further question of tracing of the trust funds argued in the briefs.

Plaintiffs also argue that adjudication should be had as to securities totaling $20,000 on deposit with the Superintendent of Banks of the State of New York by the new bank for the benefit of its trust funds. While the problem as to such funds would seem identical with that before us, no issue was made as to them by the case below, and we do not pass upon the matter.

We think that the securities which the new bank had set aside for the purpose of protecting these funds were legally available for the intended purpose and should be so employed. The judgment is therefore reversed to provide for this result.